In re CORRUGATED CONTAINER ANTITRUST LITIGATION, M.D.L. No. 310.

Appeal of Phillip L. FLEISCHACKER, Deponent.

No. 1126, Docket No. 80–1090.

United States Court of Appeals, Second Circuit.

Argued June 23, 1980.

Finally Submitted Nov. 12, 1980.

Decided March 2, 1981.

**72**

Barry T. McNamara, Chicago, Ill. (Peter Petrakis, LaDonna Loitz Chuchro, O'Brien, Carey, McNamara, Scheuneman & Campbell, Ltd., Chicago, Ill., Edward W. Zawacki, Baskin & Sears, New York City, of counsel), for deponent-appellant.

Lowell E. Sachnoff, Chicago, Ill. (Andrew M. Schatz, Barry S. Rosen, Charles R. Watkins, Sachnoff, Schrager, Jones, Weaver & Rubenstein Ltd., Chicago, Ill., Vance K. Opperman, McGovern, Opperman & Paquin, Minneapolis, Minn., Stephen D. Susman, Gary McGowan, Mandell & Wright, Houston, Tex., Robert N. Kaplan, Richard J. Kilsheimer, Kaplan, Kilsheimer & Foley, New York City, of counsel), for plaintiffs-appellees.

Sanford M. Litvack, Asst. Atty. Gen. of the United States, Washington, D.C., Robert B. Nicholson, Nancy C. Garrison, Dept. of Justice, Washington, D.C., for the United States of America as amicus curiae.

Before MULLIGAN and MESKILL, Circuit Judges, and HOLDEN, District Judge.[*]

MESKILL, Circuit Judge:

This is an appeal from an order holding appellant, Phillip Fleischacker, in civil contempt for refusing to answer questions asked at a deposition in a civil antitrust action about his involvement in a price-fixing scheme in the corrugated paper container industry.

In 1977 Fleischacker was subpoenaed to appear before a federal grand jury which was investigating alleged antitrust violations in the corrugated paper container industry. Fleischacker invoked his privilege against self-incrimination when questioned about his involvement in an alleged price-fixing conspiracy, and refused to testify. Thereupon the United States Attorney for the Southern District of Texas applied for an order pursuant to 18 U.S.C. § 6003 (1976)[1] granting Fleischacker use immunity in order to compel his testimony. Chief Judge John V. Singleton of the United States District Court for the Southern District of Texas issued the order on August 27, 1977, and shortly thereafter Fleischacker testified before the grand jury. The grand jury returned several criminal indictments against persons other than Fleischacker involved in the price-fixing scheme;

---

[*] Honorable James S. Holden, United States District Judge for the District of Vermont, sitting by designation.

1. Title 18 U.S.C. § 6003 (1976) provides:

(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

(b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

(1) the testimony or other information from such individual may be necessary to the public interest; and

(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

Fleischacker has not been criminally prosecuted.[2]

The criminal antitrust charges generated a number of private antitrust actions which were filed in various district courts throughout the country. These actions were consolidated pursuant to 28 U.S.C. § 1407 (1976) by the Judicial Panel for Multidistrict Litigation as *In re Corrugated Container Antitrust Litigation*, M.D.L. No. 310, and assigned to Judge Singleton for pretrial proceedings.

In the course of discovery, the plaintiffs subpoenaed Fleischacker to testify in New York City as a non-party witness. In preparation for Fleischacker's civil deposition, deposing counsel reviewed questions and answers contained in the transcript of Fleischacker's immunized testimony, which Judge Singleton previously had ordered released to the plaintiffs.[3] The questions posed to Fleischacker at his civil deposition were limited to questions taken verbatim from, or based directly on, his immunized testimony. Even though he had previously responded to questions concerning the same substantive matters under a grant of use immunity, Fleischacker again invoked the self-incrimination privilege and refused to testify. Judge Singleton, exercising the power of a judge of the Southern District of New York pursuant to 28 U.S.C. § 1407(b) (1976), ordered Fleischacker to answer the questions. Relying on 18 U.S.C. § 6002 (1976),[4] Judge Singleton found that deposing counsel's use of Fleischacker's im-

munized grand jury testimony in developing the civil deposition questions would render his answers so clearly and thoroughly "derived from" the immunized testimony that § 6002 would preclude its use against him in any future criminal proceedings. Thus, Judge Singleton concluded that Fleischacker's assertion of the self-incrimination privilege was unfounded and that he would have to testify. When Fleischacker persisted in his refusal to reply, an order of civil contempt was issued under 28 U.S.C. § 1826 (1976). Thereafter, the order was stayed pending the outcome of his appeal.

█ Fleischacker was understandably confused about where to appeal. Judge Singleton was a district judge of the Southern District of Texas, and the order of contempt had been issued in connection with multidistrict litigation consolidated within the Fifth Circuit; yet, Judge Singleton had "exercise[d] the powers" of a district judge of the Southern District of New York. Thus, in an eminent display of pragmatism, Fleischacker appealed simultaneously to the Second and Fifth Circuits. This Court dismissed the appeal without prejudice to reinstatement, exercising its discretion to allow the Fifth Circuit to determine whether it had jurisdiction to decide the appeal. *In re Corrugated Container Antitrust Litigation*, No. 80–1090 (2d Cir. Apr. 7, 1980). The Fifth Circuit consolidated Fleischacker's appeal with those of Charles J. Franey and Alex Hopkins, also

---

**2.** Nine manufacturers of corrugated products and nine individuals were indicted for felonies. Five manufacturers and seventeen individuals were indicted for misdemeanors. Those defendants who stood trial were acquitted. *See In re Corrugated Container Anti-Trust Litigation*, 620 F.2d 1086, 1088 (5th Cir. 1980).

**3.** The propriety of disclosing the grand jury testimony is not before us. However, it is currently being litigated in the Fifth Circuit. *See In re Corrugated Anti-Trust Litigation, supra*, 620 F.2d at 1089 n.2.

**4.** Title 18 U.S.C. § 6002 provides:
Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

(1) a court or grand jury of the United States,

(2) an agency of the United States, or

(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House, and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

non-party witnesses in the *Corrugated Container* litigation.[5] The appeals of Franey and Hopkins were identical to that of Fleischacker, except that the former had been deposed in Texas and the latter in New York. Like Fleischacker, Franey and Hopkins had previously testified under an immunity grant before a grand jury and had later asserted that their privilege against self-incrimination when questioned at civil depositions about their involvement in the price-fixing conspiracy. The Fifth Circuit vacated the contempt orders against Franey and Hopkins "[b]ecause the district court's orders [were] supported by neither the immunity statute nor any authority inherent in the court." *In re Corrugated Container Anti-Trust Litigation*, 620 F.2d 1086, 1094 (5th Cir. 1980). The Fifth Circuit concluded, however, that Fleischacker's appeal should be heard by the Second Circuit. After examining the language of 28 U.S.C. § 1407 and Federal Rules of Civil Procedure 37 and 45, the court concluded that hearing Fleischacker's appeal "would defeat the Rules' strong policy of minimizing inconvenience to non-party witnesses [by requiring] Fleischacker and others in his position to travel thousands of miles to appeal a Rule 37(b)(1) contempt order." *Id.*, at 1091. Following this ruling by the Fifth Circuit, Fleischacker reinstated his appeal before us and we now rule on it.[6]

### The Fifth Amendment Privilege

The Fifth Amendment to our Constitution states that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S.Const. Amend. V. In *United States v. Apfelbaum*, 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980), the Supreme Court reaffirmed that the "central standard" for application of the privilege against self-incrimination is whether " 'the claimant is confronted by substantial and real, and not merely trifling or imaginary, hazards of incrimination.' " *Id.* at 128, 100 S.Ct. at 956 (quoting *Marchetti v. United States*, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968)). There is no doubt that the answers requested of Fleischacker at his deposition concerning his price-fixing activities could tend to

---

**5.** These appeals served as test cases for scores of witnesses who claimed their Fifth Amendment privilege in civil depositions.

**6.** We express no opinion as to the correctness of the Fifth Circuit's determination concerning its own jurisdiction. After deferring to the Fifth Circuit, which declined jurisdiction of this appeal, we find a sufficient jurisdictional basis to permit us to rule. Under Fed.R.Civ.P. 45(d)(2) Fleischacker could only be deposed in the county where he was served with the subpoena or within forty miles of the place of service. Because Fleischacker resided in New Jersey, it would have been impossible to compel his attendance at a deposition in Texas. Instead, he was deposed in New York City. Under Fed.R.Civ.P. 37(a)(1), an application for an order compelling a non-party deponent to testify "shall be made to the court in the district where the deposition is being taken," in this instance, the Southern District of New York. If it had not been for the powers available to Chief Judge Singleton under 28 U.S.C. § 1407(b), a district judge from the Southern District of New York would have had to have presided over the deposition. *See* Fed.R.Civ.P. 37(a)(1); 37(b)(1); 45(d); 45(f). Under the provision of § 1407(b), however, Judge Singleton was able to exercise the powers of a district judge for the Southern District of New York

and, thus, was empowered to preside over the deposition.

According to 28 U.S.C. § 1294 (1976), an appeal from a reviewable decision of a district court shall be taken "to the court of appeals for the circuit embracing the district." Since Judge Singleton was exercising the power of a judge of the Southern District of New York, the Second Circuit would apparently have jurisdiction as the court of appeals for the "circuit embracing the district." This was the reasoning employed by the Fifth Circuit in declining to hear Fleischacker's appeal. Concerns arise, however, because this deposition was taken in the course of a § 1407 multidistrict case. Section 1407 consolidates multidistrict cases under one judge for purposes of efficiency and it is arguable that its purposes would be best served by permitting appeals to only one circuit. On the other hand, a circuit has some interest in overseeing and ensuring uniformity of treatment in discovery conducted by its district judges or judges exercising the powers of its district judges. Given the language of § 1294, our interest in uniform application of discovery rules within our Circuit, and the inconvenience of forcing non-party witnesses to appeal to distant circuit courts, we conclude that we have a sufficient jurisdictional basis to hear the present appeal.

prove elements of crimes for which he could face prosecution. The pivotal issue, however, concerns whether Fleischacker's answers might be *used* against him in any subsequent criminal proceeding, not whether he might be prosecuted for acts which his answers may touch upon.[7] The resolution of this issue necessarily turns upon the extent to which a previous grant of immunity shields a witness from prosecutorial use of statements made in a civil proceeding that are similar or identical to those made under the grant of immunity. In the absence of any risk of prosecutorial use of such statements against the witness, no basis for invoking the self-incrimination privilege would exist. *See United States v. Apfelbaum, supra.* For the reasons stated below, we conclude that when immunized testimony is the source of questions asked in a subsequent civil proceeding, responsive answers to such questions may not later be used against him in a criminal proceeding. However, to prevent undue interference with criminal prosecutions, district courts should not compel witnesses to respond to questions that do not concern subjects actually touched upon by questions appearing in

the transcript of the prior immunized testimony.

*The Scope of Use Immunity*

In *United States v. Tramunti*, 500 F.2d 1334, 1342 (2d Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974), this Court stated:

> The theory of the immunity statutes is that in return for his surrender of his fifth amendment right to remain silent lest he incriminate himself, the witness is promised that he will not be prosecuted based on the inculpatory evidence he gives in exchange.

To preserve the witness' privilege against self-incrimination, the prosecution is precluded from *using* against the defendant any responsive testimony elicited from him or any evidence subsequently derived therefrom. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In *Kastigar*, the Supreme Court rejected the contention that full transactional immunity is the only constitutionally sufficient substitute for the Fifth Amendment right to remain silent,[8] but emphasized that witnesses who are forced to testify over an

---

**7.** Fleischacker also contends on appeal that his invocation of the Fifth Amendment privilege was justified because his testimony might be used against him in a prosecution for perjury in his prior immunized testimony. A witness is entitled to claim the Fifth Amendment privilege if it might reveal perjury in a prior proceeding, *United States v. Housand*, 550 F.2d 818 (2d Cir.), *cert. denied*, 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977); *United States v. Partin*, 552 F.2d 621 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977), but Fleischacker never claimed before the district court that the incrimination he feared related to perjury in prior testimony. Therefore, the point is not properly before us on this appeal.

**8.** It had been earlier thought that only transactional immunity passed constitutional muster. *See Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). In *Counselman*, the Court invalidated a statute that afforded a witness protection only against the use of the specific testimony compelled from him under the grant of immunity, because it "could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him ...." *Id.* at

564, 12 S.Ct. at 198. The Court added a statement which led to the belief that only transactional immunity would meet the constitutional standard: "In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates." *Id.* at 586, 12 S.Ct. at 206. Later cases suggested that while derivative use immunity was required, full transactional immunity was not. *See, e. g., Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 n.18, 84 S.Ct. 1594, 1609 n.18, 12 L.Ed.2d 678 (1964). In the Organized Crime Control Act of 1970, Congress repealed a variety of immunity statutes—most of which provided transactional immunity—and enacted limited use and derivative use immunity provisions in 18 U.S.C. §§ 6001–05 (1976). *See* S.Rep.No.91–617, 91st Cong., 1st Sess. 51–56 (1969); H.R.Rep.No.91–1549, 91st Cong., 2d Sess. 42–46, U.S.Code Cong. & Admin.News 1970, 4007 (1970). Finally, the Supreme Court in *Kastigar* laid the matter to rest by labelling as "dictum" the troublesome language in *Counselman*. *See Kastigar v. United States, supra*, 406 U.S. at 454–55 & n.39, 92 S.Ct. at 1661–1662 & n.39.

assertion of their Fifth Amendment privilege must be immunized against both direct and indirect use of the compelled testimony. The Court declared that the immunity statute is constitutional only because "[i]t prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." *Id.* at 453, 92 S.Ct. at 1661 (emphasis in original).[9] The Court reaffirmed that the burden is on the government, in any subsequent criminal proceeding, to demonstrate that it has relied solely on evidence from legitimate independent sources, stating:

> This burden of proof . . . is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

*Id.* at 460, 92 S.Ct. at 1665. Thus, in *United States v. Nemes*, 555 F.2d 51 (2d Cir. 1977), this Court ruled that a prosecutor's heavy burden was not satisfied by a mere demonstration that "he [had] had no direct or indirect access to the grand jury minutes." *Id.* at 55. The *Nemes* panel declared that the "Government's burden is a 'heavy one' and properly so lest it become 'the loose net to trap tainted evidence' of which Mr. Justice Marshall warned in dissenting as to the constitutionality of use immunity." *Id.* (quoting *Kastigar v. United States, supra,* 406 U.S. at 461, 467, 92 S.Ct. at 1665, 1668). *See also United States v. Kurzer*, 534 F.2d 511 (2d Cir. 1976). Thus, it is clear that

when a *prosecutor* uses immunized testimony to obtain evidence against a defendant, such evidence cannot be used against the defendant because it is derived from the immunized testimony. The question remains, however, whether evidence obtained by a private litigant in the same manner may be used subsequently by a prosecutor against the witness.

 Fleischacker argues that where a civil litigant, rather than a prosecutor, uses immunized testimony as the source of his questions, noncompelled[10] answers to such questions may freely be used in a subsequent prosecution against the witness. Fleischacker claims that prosecutorial use of testimony elicited in a civil action from a witness in this manner "is *not* the type of derivative use prohibited by Section 6002 as anticipated in *Kastigar*," because the connection between the immunized testimony and the civil testimony "is wholly unrelated to any criminal prosecution or investigation." In other words, Fleischacker argues that if a nonprosecutor obtains immunized testimony and uses it to develop evidence, § 6002 does not preclude a prosecutor from using such evidence. Thus, Fleischacker contends that his assertion of the self-incrimination privilege was proper and that Judge Singleton's order holding him in contempt must be reversed. But we believe that to permit a prosecutor to use such laundered testimony would violate the constitutional requirement that a witness' compelled testimony "can in no way lead to the infliction of criminal penalties," *Kastigar v. United States, supra,* 406 U.S. at 461, 92 S.Ct. at 1665.[11] The position advanced by

---

**9.** The only exception is the narrow one which arises in a prosecution for perjury. *See United States v. Apfelbaum*, 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980).

**10.** Of course, where the court *compels* the witness to answer the questions, as actually occurred here, the Fifth Amendment itself clearly proscribes use of the compelled testimony against the witness. *Adams v. Maryland*, 347 U.S. 179, 181, 74 S.Ct. 442, 444, 98 L.Ed. 608 (1954). *See* note 13 *infra.*

**11.** In *United States v. Kuehn*, 562 F.2d 427 (7th Cir. 1977), a witness who had given immunized

testimony before a federal grand jury repeated that testimony to someone he knew was a reporter. The court ruled that the testimony to the reporter could be used against the witness in a criminal prosecution because the "testimony could not have been derived from [the] immunized grand jury testimony." 562 F.2d at 432. Two factors distinguish *Kuehn* from the case at bar. First, Kuehn voluntarily spoke to the reporter, whereas Fleischacker was compelled to answer the deposition questions. Second, the reporter apparently had not read the grand jury transcript, whereas the deposing party in this case based his questions on that immunized testimony.

Fleischacker is supported neither by precedent nor by the language of § 6002, which comprehensively precludes prosecutorial use of "any information directly or indirectly derived" from immunized testimony. Therefore, we reject Fleischacker's position.

In *Appeal of Starkey*, 600 F.2d 1043 (8th Cir. 1979), the Eighth Circuit addressed this issue in an action strikingly similar to the case at bar. Carlos Starkey testified before a grand jury under a grant of use immunity about a price-fixing conspiracy in the dairy business in central Arkansas. Thereafter, the State of Arkansas brought a civil anti-trust action against members of the conspiracy and summoned Starkey to appear at a civil deposition. Prior to the deposition, the transcript of Starkey's immunized testimony was released to the State of Arkansas. Starkey invoked his self-incrimination privilege when questioned about the price-fixing conspiracy at the civil deposition but was nonetheless ordered to testify. On appeal, observing that the state had relied upon the grand jury testimony for the questions it posed to Starkey at the civil deposition, the Eighth Circuit declared that the "deposition testimony would be tainted and unavailable for criminal prosecution of Starkey." 600 F.2d at 1047. Thus, the court concluded that since there was no risk that the civil testimony would be used against Starkey, he could not properly invoke his Fifth Amendment privilege and could be compelled to testify.

We agree with the Eighth Circuit and hold that where a transcript of a witness' immunized testimony constitutes the source of questions posed to the same witness in a civil proceeding, responsive answers to such questions are necessarily "derived from" the immunized testimony, and thus unavailable for subsequent prosecutorial use. Since answers to questions derived from immunized testimony cannot be used against the witness in any criminal proceed-

ing, it follows that, in such cases, the Fifth Amendment privilege against self-incrimination cannot be properly invoked. Therefore, once a court determines that immunized testimony has provided the source of the questions posed, the court may compel the witness to respond without infringing the Fifth Amendment.

The majority of the panel in the Fifth Circuit companion case, *In re Corrugated Container Anti-Trust Litigation*, 620 F.2d 1086 (5th Cir. 1980), reasoned that it would be inappropriate for a court presiding over a civil deposition to consider whether a witness' testimony might be "derived from" prior immunized testimony and thus unavailable for future prosecutorial use. *Id.* at 1093. According to the Fifth Circuit, the only occasion on which the trial judge should make such a determination is where a previously immunized witness has been indicted and the government is seeking to introduce evidence to secure his conviction.[12] In all other cases, the court concluded, the previous grant of immunity should be disregarded and the trial court should uphold the assertion of privilege if (i) the "answers to the questions might tend to reveal that the witness has engaged in criminal activities" and (ii) "there is a risk, even a remote risk, that the witness will be prosecuted for the criminal activities that his testimony might touch on." *Id.* at 1091 (citing *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1087 n.5 (5th Cir. 1979)). Thus, under the Fifth Circuit's reasoning, the dispositive issue in determining whether an assertion of the privilege should be upheld in all cases is whether there exists a risk of criminal prosecution for acts which the testimony might concern, not whether there is a risk that the testimony might be used against him.

 The Fifth Circuit's principal concern was that compelling testimony over

---

12. The Fifth Circuit recognized that § 6002 allows district courts to determine whether evidence is "derived" but, relying on *Kastigar v. United States, supra*, held that such a determination may only be made where the immunized witness is subsequently prosecuted. The court

reasoned that, "[s]ince the Government must bear the burden of proof on the issue of 'taint,' it follows that the issue was not properly raised in the present case, where the Government is not even a party." 620 F.2d at 1093.

a witness' assertion of privilege would result in "de facto" grants of immunity, since such testimony cannot subsequently be used in a criminal proceeding against the party compelled.[13] The court feared that the "resulting proliferation of 'immunized' testimony would make it almost impossible for the Government, in a subsequent criminal trial, to sustain its heavy burden of proving that its prosecution is untainted." *Id.* at 1094. Thus, the Fifth Circuit concluded, the trial judge's inquiry concerning whether to compel testimony should be limited to a determination of whether the answers might tend to reveal criminal activity for which the witness faces possible criminal prosecution.

■ We cannot agree with the Fifth Circuit's formulation. As Judge Johnson observed in his dissent, courts traditionally have ruled upon the correctness of invoking the privilege and thus the propriety of compelling a witness to testify over its assertion. *See Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *Rogers v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951). In deciding whether to uphold a witness' assertion of the self-incrimination privilege in cases such as this, the district judge need only determine whether prior immunized testimony has served as the source of the questions being asked. If so, any responsive answer by the witness to such questions necessarily will "derive from" the immunized testimony and thus be unavailable for future use against the witness in a criminal prosecution. Moreover, we do not agree that compelling a previously immunized witness to testify over an assertion of his privilege will result in a proliferation of *de facto* grants of immunity. We are satisfied that compelling a witness to answer questions a second time that were previously answered under a grant of immunity does not result in an expansion of the original grant of immunity. Rather, such responses would come within the original statutory immunity grant because, by necessity, they would derive from the original immunized testimony. Thus, no *de facto* grant of immunity will have occurred.

*The Need to Minimize Interference with Criminal Prosecutions*

Having determined that a witness may not properly invoke the self-incrimination privilege when asked questions actually derived from his own previously immunized testimony, the issue remains whether answers may be compelled to questions which are broader than those asked in the course of the immunized testimony.

When a prosecutor questions a witness upon whom use immunity has been conferred, he often is constrained to limit his questioning to avoid rendering a future criminal prosecution of the witness practically impossible. The more penetrating and extensive the questioning, the more difficult becomes a prosecutor's burden subsequently to demonstrate that the evidence he "proposes to use is derived from a legitimate source wholly independent of the com-

---

**13.** Immunity is a creature of statute and as such can be conferred only in a manner consistent with its legislative design. *United States v. Bryan*, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950). Section 6003 empowers the executive branch of the government to confer immunity upon a witness to compel testimony over an assertion of privilege; courts cannot confer immunity upon a witness on their own initiative. *In re Daley*, 549 F.2d 469, 479 (7th Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977). The discretion is placed in the executive branch, not in the judiciary. *Ullman v. United States*, 350 U.S. 422, 432, 76 S.Ct. 497, 503, 100 L.Ed. 511 (1956); *In re Daley, supra*, 549 F.2d at 478–79. Nevertheless, where a "district court errs in making a ruling on privilege an after-the-fact exclusionary rule will apply to prevent the introduction of that evidence against the witness." *In re Folding Carton Anti-Trust Litigation*, 609 F.2d 867, 872 n.11 (7th Cir. 1979). Thus, the operation of the exclusionary rule results in a *de facto* grant of immunity. But "this exclusionary rule is solely remedial and cannot be used as a rationale to support a judicial decision which contravenes the fifth amendment's protection." *Id.* at 872 n.11. Though the protection afforded a witness by *de facto* immunity grants necessarily must be coextensive with grants of immunity obtained under the immunity statute, conferral of *de facto* immunity is nevertheless unauthorized.

pelled testimony," *Kastigar v. United States, supra,* 406 U.S. at 460, 92 S.Ct. at 1665. A civil litigant, unlike a prosecutor, is not concerned about interfering with subsequent prosecutions. If courts were to compel a witness to respond to questions posed by a civil litigant, simply on the ground that they related to the subject matter of the immunized testimony, the testimony often would go beyond the intended scope of the prosecutor who conducted the original examination and possibly frustrate the government's desire to prosecute the witness. Immunized testimony can serve as the source of a plethora of questions that were intentionally withheld by the prosecutor in a calculated effort to contain the scope of the use immunity then being conferred.

In *United States v. Starkey, supra,* the Eighth Circuit ruled that the previously immunized witness in that case was "required to answer only questions which [were] within the same time, geographical and substantive framework as the grand jury testimony." 600 F.2d at 1048. But we are of the opinion that the scope of examination permitted under the above standard is not sufficiently circumscribed; it would seem to permit courts to compel a witness to answer any question that relates to the subject matter of the immunized testimony and thus allow the scope of the questions asked under the immunity grant to be greatly exceeded.[14] The potential for interfering with prosecutions this standard po-

ses, therefore, compels us to reject it in favor of a narrower rule. To prevent prosecutions from being unnecessarily hampered, district courts should not compel witnesses to respond to questions other than ones concerning specific subjects that actually were touched upon by questions appearing in the transcript of the immunized testimony. To make this determination, the district court need only refer to the transcript of the immunized testimony.

In the case at bar, most of the questions directed at Fleischacker at his civil deposition were read verbatim from the transcript of the immunized testimony. Several other questions involved only the substitution of proper names for pronouns, and in these instances, the persons' identities were derived from other portions of the transcript. It cannot be disputed that all of the foregoing questions concerned specific subjects that actually were touched upon by questions appearing in the transcript of the immunized testimony. Therefore, Fleischacker has no Fifth Amendment privilege to refuse to answer those questions, and the order of the district court holding Fleischacker in contempt for refusing to testify as to those matters is affirmed.

Several of the questions directed at Fleischacker at his deposition, however, went well beyond the scope of the immunized testimony. For example, on September 1, 1977, in the course of an immunized interview between Fleischacker and government prosecutors, Fleischacker was asked

14. Problems should only arise in cases in which a previously immunized witness fails to assert his self-incrimination privilege in response to questions propounded by an examining party in a civil case. In cases where the prior immunized testimony has not been released, there would be no question that the immunized testimony did not constitute the source of the questions posed to the witness. Therefore, statements made in response to such questions would be admissible against the witness in a subsequent criminal case.

Where, however, an examining party had access to a witness' prior immunized testimony and the witness voluntarily answered questions posed by the examining party without asserting his privilege, a determination might have to be made in a subsequent criminal proceeding as to whether the immunized testimony did, in fact,

serve as the source of the questions asked. Where the questions were taken verbatim from the grand jury transcript, the task is simple: answers to such questions clearly would be derived from the immunized testimony. Where the questions do not appear verbatim in the transcript, doubts should be resolved against admissibility to insure the broad protection contemplated by *Kastigar.* Therefore, where the examining party had access to the immunized testimony *and* the question concerned the same subject matter, the immunized testimony should ordinarily be considered to have been the source of the question posed. Responsive answers to such questions would, therefore, ordinarily be "derived from" the immunized testimony and would be unavailable for prosecutorial use.

about certain price communications he had had with Walter A. Trautman. At the civil deposition, after a series of verbatim questions were directed at Fleischacker concerning his dealings with Mr. Trautman, deposing counsel posed the following questions:

Mr. Fleischacker, would you tell me with *what employees of other corrugated manufacturers* have you had pricing discussions?

App. 402 (emphasis added),

Mr. Fleischacker, would you tell me whether any such price communications *with other employees of corrugated manufacturers* were by telephone?

App. 405 (emphasis added), and

Mr. Fleischacker, would you describe the nature of your price communications *with employees of other corrugated manufacturers*?

App. 408 (emphasis added). These questions obviously went far beyond the scope of the immunized testimony from which they supposedly were derived. The particular subject matter touched upon by the related transcript questions specifically dealt with Fleischacker's pricing communications with one individual, Trautman. The questions set forth above, however, requested information concerning communications Fleischacker might have had with "employees of other corrugated manufacturers." Since the questions clearly went beyond the specific subject covered in the immunized testimony—Fleischacker's communications with Trautman—that portion of Judge Singleton's order holding Fleischacker in contempt for refusing to respond was improper

and is therefore vacated. In a few additional instances, Judge Singleton ordered Fleischacker to respond to similarly overbroad questions,[15] and his order holding Fleischacker in contempt for refusing to answer those questions likewise is vacated.

Affirmed in part, vacated in part, and remanded for further proceedings not inconsistent with this opinion. The parties shall bear their own costs of this appeal.

---

15. At another point in the deposition Fleischacker was asked to respond to a question taken verbatim from his immunized testimony that concerned his having "honored" the prices of a competitor, Container Corporation. App. 410. Thereafter, deposing counsel posed the following question:

Mr. Fleischacker, would you inform me of any other occasions on which you honored the price of *another corrugated manufacturer*?

App. 413 (emphasis added). Later, the following question was asked:

Mr. Fleischacker, would you tell us from or to which competitors you sent or received price information for the period 1970 to 1975?

App. 419–20. The scope of the questions quoted above clearly exceeded the breadth of the questions asked in the course of Fleischacker's immunized testimony. These questions, if answered pursuant to court order, are good examples of the kind of inquiries that could give rise to a broad *de facto* immunity grant. Responsive answers to these questions by Fleischacker could have covered his entire involvement in the price fixing activity in the industry, and thus, as a practical matter, could have precluded the possibility of his prosecution for any role he had played in it. District courts must take pains in these cases to compel answers only to those questions which are confined to the specific subject matter touched upon by questions in the transcript of the immunized testimony.