**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Leevaughn TONEY, Defendant-Appellant.**

No. 78–5340.

United States Court of Appeals,
Sixth Circuit.

Argued April 20, 1979.

Decided June 15, 1979.

---

Michael G. Dane, Cleveland, Ohio, for defendant-appellant.

James R. Williams, U.S. Atty., Cleveland, Ohio, Dale F. Kainski, for plaintiff-appellee.

Before EDWARDS, Chief Judge, and KEITH and MERRITT, Circuit Judges.

MERRITT, Circuit Judge.

After a jury trial in the United States District Court for the Northern District of Ohio, appellant Toney was convicted of bank robbery, in violation of 18 U.S.C. § 2113(a), and was sentenced to fifteen years' imprisonment. We reverse (1) because of an erroneous ruling by the trial court which prevented Toney from presenting evidence critical to his defense; and (2) because of the prosecutor's closing argument which, although obviously calculated to exploit the error, rendered it fatal instead.

## I.

On June 14, 1977, three masked men robbed the federally-insured Home Savings and Loan Association in Liberty Township, Ohio. Of the $6,231 stolen, there were ten $20 bills and four $50 bills of so-called "bait money." Everyone who witnessed the robbery from inside the bank agreed that there had been three robbers, but a man who had been out on the street at the time testified that he thought, but could not be sure, that there might have been a fourth person in the "getaway car." None of the witnesses could positively identify Toney either from their independent recollections of the crime or from the bank surveillance photographs, although there was testimony, and the bank photos confirmed, that one of the robbers was of approximately the same height and weight as Toney.

The most damaging evidence against Toney consisted of a nylon stocking with holes cut in it and one $20 bill and one $50 bill of the stolen bait money, all found during a search of his residence three days after the robbery. In addition, it was established that Toney's wife had paid her tuition at a local vocational school the day after the robbery with a $50 bait bill.

Toney based his defense at trial upon a statement he had volunteered to the FBI on June 20, 1977, three days after his arrest. At that time he admitted to the interrogating agents that the robbery had been his idea, but he insisted that he had gotten nervous about the plan the day before the robbery and had not accompanied his partners, Willie and Henry Eley, to the bank on June 14. His replacement in the robbery scheme, he claimed, had been Jimmie King. He further explained that he had won the incriminating bait bills and the other money found at his residence while gambling with friends at two local clubs on June 14, and the next day. Among the gamblers had been Jimmie King, who, according to Toney, had been playing with a large sum of money.

The government sought to blunt Toney's defense through the testimony of two men with whom Toney had been gambling on June 14 and 15. David Walden testified that he lost some money to Toney in a dice game on the afternoon after the robbery, but that on the next day, June 15, he had won big from Toney, approximately $1,000. The implication was that Toney had suffered a net loss while gambling on June 14 and 15. Otis Woods, the manager of one of the clubs where the gambling took place,

testified that Toney had played cards and dice in his establishment on both the 14th and 15th and that on neither day had Jimmie King gambled with Toney. According to Woods, King participated in the dice games only as the "stickman," the person who handles the dice and holds the wagers for the players.

All the while the government had in its possession evidence that, as to certain critical details, directly contradicted the testimony of Woods and Walden and substantially corroborated Toney's post-arrest statement concerning his gambling activities on June 14 and 15. The evidence was a statement taken from Jimmie King at the time of his arrest on June 21, 1977, for the same robbery. King admitted that he had played dice with Toney on June 14 at Woods' establishment and that both men had won a substantial sum of money, Toney between $500 and $1500 and King approximately $500. King stated that Toney had started out betting with only $500. King said he had not gone to work at the club on the 15th but that, when he returned on the 16th, he heard that Toney had again "won big" the previous day.

As we explain below, it was the trial court's erroneous exclusion of the King statement from evidence, coupled with a highly questionable attempt by the prosecutor to capitalize on this error, that requires reversal.

## II.

At the outset, it is important to note that the government's handling of the King statement was, from the beginning, somewhat less than conscientious. The government was on notice of Toney's defense from June 20, 1977, the day Toney made his statement to the FBI. The very next day, the FBI took Jimmie King's statement, which corroborated Toney's story in several important respects. Despite the fact that defense counsel made a general request for all *Brady* material some eight months prior to trial, and followed that up just prior to jury selection with a specific request for any evidence tending to corroborate Toney's

defense that he had won the stolen bait money gambling with, among others, Jimmie King, the government did not make the King statement available to the defense until the morning of the last day of trial, only minutes before Walden and Woods took the stand. Apparently, the statement was buried among numerous other documents being turned over to the defense under the Jencks Act.

The government now insists that the delay was inadvertent, but even if we ascribe the government's conduct only to gross negligence rather than deception, we are unwilling to overlook it. Technically speaking perhaps, neither *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), nor any of its progeny, requires the government to disclose exculpatory evidence to the defense at any particular time, so long as disclosure is made at some point before the trial is over. It may be that the government thus lived up to the letter, if not the spirit, of *Brady* in this case. We cannot deny, however, that our reaction to the government's later conduct is colored somewhat by our failure to understand why the King statement was not disclosed months earlier.

In any event, when the King statement was finally turned over, defense counsel attempted to introduce it into evidence. The government objected on hearsay grounds. The objection was sustained over defense counsel's argument that the statement was an admission against King's interest and therefore admissible.

Defense counsel then called King as a witness. Out of the presence of the jury, King, on the advice of his attorney, stated to the Court that he would invoke his Fifth Amendment privilege against self-incrimination in response to any questions concerning either the bank robbery or his gambling activities with Toney on the evening after the robbery. The trial court ruled that King's claim of privilege was proper.

█ Inexplicably, the King statement was not admitted into evidence at that point. Once King's claim of privilege had

been sustained, he was "unavailable" under Rule 804(a)(1) of the Federal Rules of Evidence. And we think the statement was against King's penal interest, and therefore admissible under Rule 804(b)(3), both because it revealed King's involvement in illicit gambling activities and because it disclosed that King had been gambling with a large sum of money a few hours after the bank robbery for which he had just been arrested. The District Court implicitly recognized this when it ruled that King could properly refuse to answer questions concerning the matters contained in the statement on self-incrimination grounds.

■ But even were it less clear that the King statement was admissible under the statement against penal interest exception to the hearsay rule, we think the statement should have been admitted under Rule 804(b)(5), because it was "offered as evidence of a material fact," it was "more probative on the point for which it [was] offered than any other evidence" Toney could procure, and because, in our opinion, "the interests of justice" demanded that the jury consider it. The potential value of the King statement to Toney's defense cannot be overestimated. A major question for the jury was, who was the third robber? Toney had claimed all along that King had been the third robber accompanying the Eleys to the bank, and the bulk of the government's evidence indicated that there had been three, and only three, robbers. The record also discloses that King, like Toney, was of approximately the same height and weight as the third robber. More importantly, the King statement corroborated Toney's own story that he had been gambling with King after the robbery, where he had won the large sum of money found by the FBI at his residence. And, if believed, the King statement might have fatally undermined the credibility of the two witnesses offered by the government to rebut Toney's story— Walden, who claimed that Toney had lost, rather than won, a substantial sum of mon-

ey during the critical period, and Woods, who stated flatly that King had not gambled with Toney on either June 14 or 15.

We therefore conclude that the district court erred by not admitting the King statement after King had refused to testify on self-incrimination grounds. Any argument that the error could have been harmless is absolutely foreclosed by what followed during closing argument.

The thrust of the prosecutor's summation was, predictably, that the evidence implicating Toney in the robbery was strong and that Toney's story was weak. The prosecutor hit the latter point particularly hard, and the climax of his attack on Toney's credibility was as follows:

You decide for yourself what is believable and what is unbelievable.

\* \* \* \* \* \*

I would ask you also to concentrate on this one fact: \* \* \* Have you heard any testimony from any witness either the Government brought forward or the Defense brought forward that Jimmie King did any gambling that night?

Jimmie King was there, but Jimmie King, no witness has testified to you or told you, did any gambling on the night of the 13th or the 14th, and there is no testimony that he was gambling or anywhere near a gambling place on the 13th or 14th in the afternoon.

I submit to you, cut through the smoke screen. It is the Defendant's contention he got the money from Jimmie King.[1]

Thus the prosecution argued that the jury ought to disregard Toney's defense because Toney had not produced any evidence to support his claim that he had been gambling with Jimmie King following the robbery.

In the circumstances, we find this line of argument to be foul play. As he was making the argument, the prosecutor well knew that evidence did exist to corroborate Toney's story in this regard and that it had

---

1. The prosecutor was mistaken when he argued that the dates at issue were June 13 and 14, rather than June 14 and 15. The robbery oc-

curred on June 14, and the controversy centered around Toney's gambling activities later that day, and the next day.

come from King himself. Moreover, the nature of the closing argument forecloses any possible claim that the exclusion of the King statement could have been harmless error. The prosecutor told the jury that it should convict because of the absence of evidence which he knew existed. We have no choice but to assume that the jury was persuaded by the prosecutor's remarks and convicted for that reason.

Accordingly, the judgment of conviction is reversed, and the case is remanded to the District Court for a new trial.