**In re CORRUGATED CONTAINER ANTITRUST LITIGATION.**

**Appeal of John CONBOY, Deponent.**

**No. 81–1960.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1981.

Decided Oct. 16, 1981.

Certiorari Granted Jan. 11, 1982. See 102 S.Ct. 998.

Michael W. Coffield, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for deponent.

Francis J. McConnell, McConnell & Campbell, Chicago, Ill., for appellee.

Before CUMMINGS, Chief Judge, PELL, SPRECHER, BAUER and WOOD, Circuit Judges.

SPRECHER, Circuit Judge.

This is an appeal from an order holding a non-party deponent in civil contempt for asserting the Fifth Amendment in response to questions read verbatim from or closely tracking transcripts of the deponent's previously immunized testimony. The district court ordered the deponent to answer the questions, apparently on the ground that he would not be subject to future criminal prosecution based on this testimony. For the reasons stated herein, we reverse the judgment of the district court.

## I

John A. Conboy is a former executive of the Weyerhaeuser Company. He was one of numerous immunized grand jury witnesses in an investigation leading up to the indictments of fourteen companies and twenty-six individuals for a nationwide conspiracy to fix prices in the corrugated container industry. Relying on a promise of immunity from the Justice Department, Conboy submitted to an interview by Justice Department attorneys who questioned him extensively concerning his participation in and knowledge of alleged price communications and agreements among suppliers in the corrugated container industry. Subsequently, Conboy testified before a grand jury regarding these issues, having received a separate and independent grant of use immunity.

Following the conclusion of the criminal trial, numerous civil actions were brought against the major corrugated container manufacturers, including Weyerhaeuser. These civil cases were consolidated in *In Re Corrugated Container Antitrust Litigation,* MDL 310 (S.D.Tex.). In this litigation, class action plaintiffs either tried or settled their claims. The class trial and many of the class settlements are the subject of pending appeals. Eighteen "opt-out" cases remain pending before the district court. The opt-out plaintiffs allege, among other things, that the defendants were engaged in, and fraudulently concealed, an ongoing price-fixing conspiracy in the corrugated container industry through 1978.

The opt-out plaintiffs subpoenaed several previously immunized grand jury witnesses, including Conboy, for deposition testimony and production of documents. On May 20, 1981, Conboy appeared with counsel in Chicago for deposition pursuant to a subpoena. At his deposition, Conboy initially testified as to the dates and general nature of his employment with Weyerhaeuser. He was then asked: to confirm that he had testified at the Justice Department interview and the grand jury; to identify as "true and correct" a transcript of his interview and of his grand jury testimony;[1] and whether his responses at the interview and before the grand jury had been true and correct. Conboy refused to answer these and other questions pertaining to his interview and grand jury testimony on the basis of the Fifth Amendment privilege against self-incrimination.[2] He did acknowledge that any tes-

---

1. The parties do not dispute that the plaintiffs received copies of the transcripts of the Justice Department interview and the grand jury testimony. In this appeal, the parties do not state how these transcripts were made available to them. In *In re Corrugated Container Litigation, Appeal of Charles J. Franey,* 620 F.2d 1086 (5th Cir. 1980), involving an appeal from the same multi-district litigation by other witnesses for refusals to answer deposition questions regarding previous grand jury testimony, the transcript had been made available to the

plaintiffs by court order, which was appealed. 620 F.2d at 1089 n.2. Here, Conboy does not challenge the provision of transcripts to plaintiffs and we express no opinion as to the propriety of that action.

2. The balance of the deposition consisted of questions previously asked at the Department of Justice interview concerning Conboy's alleged involvement in price fixing activities during his tenure as Regional Marketing Coordinator for Weyerhaeuser's Central Region in

timony which he may have provided was given pursuant to prior grants of immunity. Conboy's counsel advised the plaintiffs' counsel that Conboy would invoke his Fifth Amendment privilege in response to all further questions concerning pricing activities during his tenure as Weyerhaeuser's Regional Marketing Coordinator in Worthington, Ohio.

The plaintiffs' counsel then suspended the deposition and telephoned the judge presiding over the multi-district litigation. The judge was informed of the relevant facts regarding Conboy's employment with Weyerhaeuser and that Ohio had no statute of limitations for antitrust actions.[3] Conboy's counsel argued that, even though the prior testimony had been immunized, new answers to those questions, or even new answers confirming that the previous answers had been made could tend to incriminate Conboy.

The district court judge advised the parties that he was empowered to sit as a district judge in Illinois under 28 U.S.C. § 1407,[4] and began to question Conboy regarding his employment history in Ohio and his knowledge of possible prosecution by Ohio authorities.[5] Based on Conboy's inability to establish the existence of a pending criminal investigation, the court ordered him to answer the specific questions previously asked. Conboy again refused to answer, asserting his Fifth Amendment privilege. The court found him to be in civil contempt pursuant to 28 U.S.C. § 1826, fined him $5,000, and imposed a six-month imprisonment. The court stayed execution of the order pending appeal. Conboy now appeals to this Court pursuant to 28 U.S.C. § 1826.[6]

Worthington, Ohio. The interrogation fell into the following pattern: a question was asked from the transcript; then it was rephrased to include the transcript answer (i. e., "[i]s it not the fact that...."); finally, Conboy would be asked if he had "so testified" in his interview statement. Examples of this three-question pattern are as follows:

Q: Who did you have price communications with at Alton Box Board?

. . . .

Q: Is it not the fact that you had price communications with Fred Renshaw and Dick Hermans ... at Alton Box Board?

. . . .

Q: Did you not so testify in your government interview statement of January 10, 1978?

Tr., 20, 20–21, 22.

Q: Would your prices be at or above his prices, referring to Alton's prices?

. . . .

Q: Is it not the fact that you would price slightly above or slightly below the Alton prices?

. . . .

Q: And did you not so testify in your government interview statement?

Tr., 31, 32.

**3.** Ohio's criminal antitrust statute states in pertinent part:

No Statute of Limitation shall prevent or be a bar to any suit or proceeding for any violation of Section 1331.01 to 1331.14, inclusive, of the Revised Code.

Ohio Rev.Code Ann. § 1331.12. The constitutionality of this statute has been upheld in *Ohio ex rel. Brown v. Klosterman French Baking Co.*, 1977–1 Trade Cases (CCH ¶ 61,361 (S.D. Ohio, 1976).

**4.** 28 U.S.C. § 1407(b) provides, in pertinent part, that, in multi-district litigation, judges to whom pretrial proceedings are assigned "may exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions ...." *See In re Corrugated Container Antitrust Litigation, Appeal of Phillip L. Fleischacker*, 644 F.2d 70, 76 n.6 (3d Cir. 1980).

**5.** This interrogation concluded with the following:

Q: Now, has anyone from the Attorney General's Office in Ohio contacted you relating to your work?

A: No.

Q: Prior to December 31, 1975?

A: No, sir.

Q: Are you a party to any lawsuit involving that work?

A: I am not.

Q: Have you been called as a witness— other than in this case—in any case arising out of Ohio?

A: No, Your Honor, I haven't.

Q: Related to the corrugated industry and your work in that industry?

A: No, sir.

Tr., 51–52.

**6.** 28 U.S.C. § 1826(b) provides, in pertinent part, that "[a]ny appeal from an order of confinement under this section [recalcitrant witnesses] shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal." Conboy's appeal was

## II

There are two major issues in this appeal. The first is whether Conboy faces any risk of prosecution.[7] The second is, even if there is a risk of prosecution, whether a court can deny the protection of the Fifth Amendment if it concludes that the answers to the questions asked will be so "tainted" by previous grants of immunity that those answers will be inadmissible in subsequent criminal proceedings. Before reaching these two issues, however, it is important to examine the proper scope of interpretation of the Fifth Amendment's protection against self-incrimination.

The Fifth Amendment to our Constitution states that "[n]o person shall ... be compelled in any criminal case to be a witness against himself." U.S.Const.Amend. V. The plaintiffs argue that the testimonial privileges of the Fifth Amendment must be narrowly construed. Relying on *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972), the plaintiffs argue that "the public is entitled to every man's evidence." Pl.Br. at 6. First, *Branzburg* is inapposite, as it held that the First Amendment created no "reporter's privilege" not available to other citizens. Second, plaintiffs failed to complete the quoted sentence in *Branzburg*. The Court carefully acknowledged limitations on the right to evidence, stating, "the longstanding principle that 'the public ... has a right to every man's evidence,' *except for those persons protected by a constitutional, common-law, or statutory privilege,* ... is particularly applicable to grand jury proceedings." (emphasis added) (citations and footnote omitted). Indeed, the *Branzburg* Court

added, to further emphasize that it in no way envisioned any narrowing of the Fifth Amendment:

Until now the only testimonial privilege for unofficial witnesses that is rooted in the federal constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.

408 U.S. at 689–90, 92 S.Ct. at 2661 (footnote omitted).

The plaintiffs also rely on *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) as supporting their contention that a constitutional protection should be narrowly interpreted when balanced against a private litigant's evidentiary need. But the plaintiffs' reliance on *Nixon* is also misplaced. The *Nixon* Court emphasized that the issue before it did not involve balancing a *specific* constitutional privilege against the need for evidence in *civil* litigation.[8] The Court's care in expressing what it was *not* considering suggests that even an evidentiary privilege not specifically stated in the Constitution, such as that asserted by President Nixon, should be given a high degree of deference. *Nixon* in no way derogates from the fundamental primacy of constitutional principles.

 The Fifth Amendment privilege against self-incrimination is one of the core concepts of our adversary judicial system. The privilege is a shield against the dangers of an inquisitorial system of jurisprudence. As Justice Blatchford stated in *Counselman*

docketed with this Court on June 17, 1981. The parties completed their submission of briefs to this Court on July 10, 1981.

**7.** A preliminary question is whether answers to the questions in issue might tend to reveal that the witness was engaged in criminal activity. *In re Corrugated Container Antitrust Litigation, Appeal of Charles J. Franey,* 620 F.2d 1086, 1091 (5th Cir. 1980). Here, there is no serious dispute that Conboy's answers might tend to reveal that he was engaged in criminal activity.

**8.** The *Nixon* Court stated:

We are not here concerned with the balance between the President's generalized interest in confidentiality and the need for relevant evidence in civil litigation, nor with that between the confidentiality interest and congressional demands for information, nor with the President's interest in preserving state secrets. We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials.

418 U.S. at 712 n.19, 94 S.Ct. at 3109 n.19.

*v. Hitchcock,* 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892), the Fifth Amendment privilege "must have a broad construction in favor of the right which it was intended to secure." The passage of time since *Counselman* has not seen any diminution in the need for constant vigilance by courts against the narrowing of this fundamental constitutional protection.

In view of the high place that the Fifth Amendment privilege occupies, both in our Constitution and in our judicial system, and in view of the strong traditional respect for each individual's rights that undergirds the privilege, the Court "has always broadly construed its protection to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action." *Maness v. Meyers,* 419 U.S. 449, 462, 95 S.Ct. 584, 593, 42 L.Ed.2d 574 (1975) (citations omitted). As the Court stated in *Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972):

> But the power to compel testimony is not absolute. There are a number of exceptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against compulsory self-incrimination. The privilege reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty . . . . This Court has been zealous to safeguard the values that underlie the privilege.

(footnotes omitted). *See Murphy v. Waterfront Comm'n.,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964) ("The Fifth Amendment privilege reflects many of our fundamental values and most noble aspirations . . . ."); *Ullman v. United*

*States,* 350 U.S. 422, 426, 426–29, 76 S.Ct. 497, 500–501, 100 L.Ed. 511 (1956) ("Time has not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit.") (Frankfurter, J.); *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951) (privilege must be accorded liberal construction); and *Arndstein v. McCarthy,* 254 U.S. 71, 72–73, 41 S.Ct. 26, 27, 65 L.Ed. 138 (1920) (privilege must be accorded broad construction).

### III

Cognizant of the need for a liberal construction of the fundamental Fifth Amendment privilege against self-incrimination, we now consider whether Conboy faced any risk of prosecution. The district court concluded, first, that Conboy could not face federal charges because the applicable five-year statute of limitations had run. Second, the district court seemed to conclude that Conboy would not face any charges in Ohio because Conboy admitted he did not know of any litigation related to the corrugated industry in the state of Ohio.[9] But the court's reasoning is erroneous for several reasons.

### A

First, and most fundamental, as this court recently held, the protection of the Fifth Amendment applies so long as there is a *possibility* of prosecution, regardless of a judge's assessment of the likelihood of prosecution. *In re Folding Carton Antitrust Litigation, Appeal of R. Harper Brown,* 609 F.2d 867 (7th Cir. 1979). We concluded in *Brown*:

**9.** The district court's order provided, in part, as follows:

> The federal statute of limitations is four [sic] years which indicates that Mr. Conboy would not be subject to federal prosecution for the period before December 31, 1975. Counsel for John A. Conboy stated that Mr. Conboy may be subject to prosecution in Ohio where there exists no applicable statute of limitations for antitrust violation. The Court questioned Mr. Conboy as to whether he knew of any pending

litigation related to the corrugated industry in the state of Ohio. Mr. Conboy answered that he has not been contacted to testify nor does he know of any such litigation in Ohio. Counsel for John A. Conboy did not present proof that any other applicable statute of limitations had not run.
*In re Corrugated Container Antitrust Litigation, Order Adjudging John A. Conboy To Be In Civil Contempt of Court,* MDL 310, 2 (S.D.Tex. May 20, 1981).

Short of the existence of one of these indicia [*viz.*, statute of limitations, immunity, double jeopardy] of an *absolute bar* to subsequent prosecution, a judge's prediction as to the likelihood of a prosecutor filing an indictment is not dispositive in ascertaining the permissible scope of a claim of Fifth Amendment privilege.

609 F.2d at 872 (footnotes omitted) (emphasis added).

This court's decision in *Brown* was relied upon by the Fifth Circuit Court of Appeals in an appeal from the same multi-district litigation on the identical substantive issue as the present case. *In re Corrugated Container Antitrust Litigation, Appeal of Charles J. Franey*, 620 F.2d 1086 (5th Cir. 1980). In *Franey*, three deposition witnesses sought review of contempt citations entered against them by the district court when they asserted their Fifth Amendment privilege in civil depositions to questions that were contained in the transcript of their prior immunized grand jury testimony. The Fifth Circuit sustained the witnesses' assertion of the Fifth Amendment privilege, because the risk that they would be prosecuted was " 'more than fanciful.' " 620 F.2d at 1092, *quoting Brown*, 609 F.2d at 871. *See In re Master Key Litigation*, 507 F.2d 292, 293 (9th Cir. 1974) (witness justified in refusing to answer unless the only danger is imaginary); *United States v. Johnson*, 488 F.2d 1206, 1209 n.2 (1st Cir. 1973) ("neither the practical unlikelihood of further prosecution, nor the Assistant United States Attorney's denial of an intention to charge conspiracy, negated [the defendant's] privilege"); and *United States v. Miranti*, 253 F.2d 135, 139 (2d Cir. 1958) (no justification for limiting the Fifth Amendment privilege whenever it appears the government would not undertake to prosecute).

The "absolute bar" test recognizes that, to the extent any doubt exists regarding the validity of the claimed Fifth Amendment privilege, the benefit of that doubt must go to the witness asserting the privilege. The determination whether to prosecute is exclusively within prosecutorial discretion. The validity of the privilege cannot be grounded on a district court's prediction of the likelihood of prosecution because the past and present behavior of prosecutorial authorities is not a sufficiently accurate indication of the risk of criminal prosecution. *See Miranti*, 253 F.2d at 139.[10]

Not only must the benefit of the doubt go to the witness claiming Fifth Amendment privilege, but also the burden of proof as to any prosecution must not be improperly shifted to the witness. As the Court stated in *Hoffman*, the witness must not be required to prove the possibility of prosecution "in the sense in which a claim is usually required to be established in court." 341 U.S. at 486, 71 S.Ct. at 818. Here, the trial court seemed to base its contempt order, in part, on Conboy's failure to prove the existence of an impending criminal prosecution against him. *See* note 9, *supra*. This basis for the contempt order is clearly incorrect. So long as there is any basis for a prosecution, the Fifth Amendment protection applies.

### B

The district court erred in concluding that Conboy could not face federal charges for his activities prior to December 31, 1975. Although the statutes of limitations have run for the antitrust charges, the plaintiffs admit that the federal statute of limitations for conspiracy does not begin to run until a defendant's last act in furtherance of the conspiracy. Unless an individual can show withdrawal from the conspiracy by an affirmative act designed to defeat

---

**10.** The *Miranti* court stated:

We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute. Such a rule would require the trial court, in each case, to assess the practical possibility that prosecution would result from incriminating answers. Such assessment is impossible to make because it depends on the discretion exercised by a United States Attorney or his successor. 253 F.2d at 139 (footnotes omitted).

the purpose of the conspiracy, that defendant remains liable for all acts committed by co-conspirators until the conclusion of the conspiracy. *See United States v. Fitzgerald*, 579 F.2d 1014 (7th Cir.), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 610, 58 L.Ed.2d 677 (1978) (prosecution of defendants not barred by statute of limitations even though they ceased active participation in the conspiracy seven years before the indictment). Conboy must harbor a reasonable fear of prosecution for federal antitrust conspiracy until 1983.

The plaintiffs argue that Conboy is not "really" subject to federal prosecution because a Justice Department attorney, in a letter to another defendant in the corrugated container civil litigation stated that the Justice Department had no intention to prosecute any previously immunized witness in the corrugated container litigation. But this is a slender reed indeed on which to deny the fundamental constitutional protection afforded by the Fifth Amendment privilege. Plaintiffs cite no law stating that the Justice Department letter is binding on the Justice Department with regard to Conboy. *See Miranti*, 253 F.2d at 139, quoted at note 10 *supra.* The key point, which plaintiffs concede, is that notwithstanding the Justice Department letter, Conboy *does* remain liable to subsequent federal prosecution.

Even if we assume—and we do not—that the Justice Department is somehow bound by a letter of one of its attorneys, it is undisputed that Conboy is subject to state antitrust charges in Ohio. Plaintiffs suggest, however, that the possibility of such prosecution is "fanciful", and that Conboy could successfully plead laches as a defense.

Plaintiffs' counsel ask us to determine, as a matter of law, that the possibility of an Ohio action against Conboy is fanciful merely because, to date, Ohio has not instituted any action of the corrugated container industry of which plaintiffs' counsel are aware. But Fifth Amendment protections should not be eviscerated merely on plaintiffs' counsel's assurances that they do not happen to know of any Ohio investigation of the corrugated container industry. Indeed, the lack of foundation for such assurances is seen in the admission of one of plaintiffs' counsel, at oral argument before this Court, that he did not know that, as indicated in *Franey*, 620 F.2d at 1092, a federal grand jury sitting in Ohio had begun its own investigation of the corrugated container industry. If counsel did not know of this federal grand jury, they very well also might not know of a state grand jury, should one be sitting.[11] This example demonstrates that constitutional protections should not be based on adversaries', or even on witnesses' knowledge of potential prosecutorial activities.

Plaintiffs respond by arguing that, even if Conboy should be prosecuted in Ohio, he would be able to invoke laches as a complete defense. For this unusual assertion, they rely on *Ohio ex rel. Brown v. Klosterman French Bakery Co.*, 1977–1 Trade Cases (CCH) ¶ 61,361 (S.D.Ohio 1976). First, as will be discussed, whether or not Conboy may utilize certain defenses in a subsequent criminal prosecution has no bearing on the legitimacy of his Fifth Amendment claim in the proceeding at issue. Second, *Klosterman*, a civil decision by a federal, not an Ohio, court in ruling on a motion for summary judgment specifically

11. In a letter after oral argument, plaintiffs' counsel stated:

In the course of the oral argument in the case of *In Re Corrugated Container Antitrust Litigation, Appeal of John Conboy*, there was a question concerning whether a federal grand jury was impaneled in Ohio to investigate the corrugated container industry. As I expressed to the Panel, it was my understanding that no such investigation was under way. To make certain that my representations to the Court were correct, Mr. Polster

of the Justice Department, Antitrust Division, Cleveland Branch, was contacted concerning this matter. Mr. Polster confirmed the accuracy of my representation to this Court by stating that he was aware of no such grand jury investigation pending at this time. Moreover, Mr. McShane of the Ohio Attorney General's Office, Antitrust Division, has stated that his office has no knowledge of any Ohio antitrust criminal investigation into the corrugated container industry.

stated that it was not "ruling upon the applicability of the doctrine of laches in the context of this lawsuit." ¶ 61,361 at 71,274. Moreover, the *Klosterman* discussion of laches was based upon a quotation from *Gardner v. Panama R.R. Co.*, 342 U.S. 29, 30–31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951), which stated that laches was a question primarily addressed to the discretion of the trial court. Indeed, the *Gardner* Court held that laches was *not* a defense to the *civil* suit there in issue. Plaintiffs present no Ohio nor any other authority establishing that laches would necessarily be a successful defense to an Ohio prosecution of Conboy.[12]

Even given the possibility of a speculative laches defense, there is no dispute that Conboy remains subject to prosecution in Ohio. But plaintiffs argue that demonstrating this liability somehow "proves too much" because in Ohio antitrust actions are not subject to a statute of limitations. Ohio Rev.Code Ann. § 1331.12. We do not see how this long-term liability "proves too much." The Fifth Amendment stands between a defendant and *any* possible prosecution. If the prosecution may be threatened over a long time, surely it does not "prove too much" to conclude that the Fifth Amendment protection must also exist for a long time. Otherwise, prosecutors could defeat the Fifth Amendment's protection by waiting to bring actions. Thus, the "proves too much" argument must fall.

In summary, despite the assurances of the plaintiffs to the contrary, Conboy might be prosecuted by both federal and state authorities. As we stated in *Brown*, so long as there is *any* possibility of prosecution, the Fifth Amendment privilege must apply.

Whether Conboy actually would be prosecuted, we cannot predict and, therefore, is irrelevant. Any doubt as to the likelihood of possible prosecution must be resolved in favor of the witness.

## IV

■ The next major question is whether a court can deny the protection of the Fifth Amendment privilege if it concludes that the answers to the questions asked will be so "tainted" by previous grants of immunity that those answers will be inadmissible in subsequent criminal proceedings. It is undisputed that, because his statements were made under grants of immunity, the transcripts of Conboy's Justice Department interview and grand jury testimony could not be used against him. But now, we must consider whether *new* answers to questions based on the earlier immunized testimony are, as a matter of law, *necessarily* themselves immunized.

There is a conflict of opinion among the circuits on this question. In *Franey*, the Fifth Circuit held that answers to verbatim questions from prior immunized testimony were not protected by the original immunity grant. But in *In re Corrugated Container Antitrust Litigation, Appeal of Phillip Fleischacker*, 644 F.2d 70 (2d Cir. 1981), and in *In re Order of Civil Contempt, Appeal of Carlos Lee Starkey*, 600 F.2d 1043 (8th Cir. 1979), the Second and Eighth Circuits held that such answers were protected.

In our opinion, the better reasoning is found in the *Franey* decision. Also, for other reasons, we conclude that the district court's conclusion that Conboy's testimony could never be used against him in subsequent proceedings was erroneous.

---

**12.** Plaintiffs suggest that Ohio Rev.Code § 1331.13 would prevent a prosecution of Conboy. Ohio Rev.Code § 1331.13 provides, in pertinent part, as follows:

If a court of record . . . in which is pending a civil or criminal action . . . so orders, no person shall be excused from attending, testifying, or producing books . . . or other documents . . . for the reason that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty. No person may be prosecuted or subjected to

a penalty for or on account of a transaction, matter, or thing concerning which he may so testify or produce evidence, documentary or otherwise, before such court, person, or officer.

This statute merely prohibits later prosecution of a witness required to testify *for the required testimony* in the same proceeding. Here, Conboy's testimony would not be ordered under the Ohio statute and, therefore, this statute would not prevent his prosecution.

## A

It is important to distinguish, at the outset of this discussion, two different concepts. The first is the court's remedial power to exclude evidence which violates the Fifth Amendment. The second is the scope of the protection afforded by a grant of statutory immunity—aside from any later effort to remedy a violation of the privilege. The basic error committed by the district court is that it confused, and lumped together, these two concepts.

This complex issue requires precise analysis. The district court concluded that Conboy's previously granted use immunity would continue to protect him if, at a later date and in a totally separate proceeding, he repeated his deposition testimony. But this reasoning, apparently based on language in *Starkey*, 600 F.2d at 1047 (possibility of later exclusion of testimony repeating earlier, immunized testimony is all the protection afforded by 18 U.S.C. § 6001), *citing Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972), is conclusory and erroneous. The district court, and the *Starkey* court, misunderstood *Kastigar* and its precursors. This confusion can be seen by examining the nature of the concept termed "immunity".

■ There is no question that the Fifth Amendment privilege against self-incrimination may be asserted in a civil proceeding, at discovery or trial, whether the person to be called is a party or a witness. In certain situations, however, the privilege can be supplanted by a statutory grant of use immunity, under 18 U.S.C. § 6001 et seq., which affords protection against self-incrimination *coextensive* with the Fifth Amendment privilege. *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661. As the Court emphasized, this coextensive protection protects only the *source*, not the *substance* of the information.[13] *Kastigar* thus teaches that a grant of use immunity for a witness in one proceeding affords *no* protection for any self-incriminating information disclosed by the witness in other proceedings, prior or subsequent to the immunized proceeding.

■ Use immunity does not even shield a witness from prosecution based on the very facts and activities testified to under the grant of immunity. *See United States v. Kuehn*, 562 F.2d 427, 430, 432 (7th Cir. 1977) (defendant created independent evidence when he repeated previously immunized grand jury testimony to a reporter; court also suggested that the defendant had created independent testimony by repeating his immunized testimony as a witness in another trial) (Swygert, J.); *United States v. First Western State Bank of Minot*, 491 F.2d 780, 786 (8th Cir.), *cert. denied sub nom., Thompson v. United States*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49 (1974) ("The

---

**13.** The *Kastigar* Court stated:

The statute's [18 U.S.C. § 6002] explicit proscription of the use in any criminal case of "testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)" is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore, is sufficient to compel testimony over a claim of the privilege. *While a grant of immunity must be afforded protection commensurate with that afforded by the privilege, it need not be broader.* Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. *The privilege has never been construed to mean that one who*

invokes it cannot subsequently be prosecuted.

406 U.S. at 453, 92 S.Ct. at 1661 (emphasis added). Later in the opinion, the Court again emphasized the limits of statutory use immunity:

The statute, like the Fifth Amendment, grants neither pardon nor amnesty. *Both the statute and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources.*

. . . .

We conclude that the immunity provided by 18 U.S.C. § 6002 leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege. The immunity therefore is coextensive with the privilege and suffices to supplant it.

406 U.S. at 461–62, 92 S.Ct. at 1665 (emphasis added).

federal government, however, can use the same evidence testified to by defendants before the grand jury if it can demonstrate that the evidence to be used against defendants came from a legitimate source wholly independent of the compelled testimonies."); and *Miranti*, 253 F.2d at 138 (witnesses' refusal, on self-incrimination grounds, to verify before grand jury statements made before a previous grand jury upheld because such verification could have been used as evidence against defendants).

■ As the above cases suggest, and as is stated in *Comment, Requiring Witnesses to Repeat Themselves*, 47 Tex.L.Rev. 266, 267 (1969), repetition of testimony in an independent proceeding may itself be viewed as incriminating. Thus, Conboy's deposition, even if it merely repeated or acknowledged his earlier testimony, could constitute an independent source of evidence against him.[14]

But the district court reasoned in a brief statement, that because Conboy testified earlier under immunity, he "cannot" be prosecuted for subsequent testimony based on the earlier testimony. The court, presumably relying on *Fleischacker* and *Starkey*, apparently concluded that the new deposition testimony would be inherently "tainted" by the previous grant of immunity and would thus, necessarily be inadmissible in any subsequent criminal proceeding.

### B

The initial problem with the *Fleischacker* theory, that subsequent verification of previously immunized testimony is necessarily

tainted, is that this theory focuses on the derivation of the deposition questions (derived from immunized testimony) rather than on the deposition answers (answered "now"). The answers, unlike the questions, are not "directly or indirectly derived" from the immunized grand jury or interview transcripts. Rather the answers are derived from the deponent's *current*, independent memory of events.

■ The misunderstanding of the nature of the answers leads to the next error in the *Fleischacker* theory, a misunderstanding of use immunity, such as given to Conboy. Both direct and indirect "use" of immunized testimony is prohibited. Direct use of previously immunized testimony would be exemplified by the introduction of that specific testimony in a subsequent proceeding. Indirect use would occur when a prosecutor has access to or is otherwise influenced by the immunized testimony and cannot prove, in a later criminal proceeding, that the evidence was derived without the aid of the immunized testimony. But neither of these concepts applies to the potential situation before us. If Conboy answers the proposed questions, those answers necessarily create a *new* source of evidence. The new answers could then be used by a prosecutor because those specific answers were not derived from the previously immunized testimony—even though the questions, of course, were so derived.[15]

### C

Another major problem with the *Fleischacker* theory, that subsequent testimony

**14.** This conclusion is buttressed by the government's policy of seeking specific grants of immunity with respect to each proceeding at which a witness testifies. *See In re Folding Carton Antitrust Litigation*, 465 F.Supp. 618, 626 (N.D.Ill.), *rev'd on other grounds*, 609 F.2d 867 (7th Cir. 1979). This policy was evidenced by the separate and distinct grants of immunity provided to Conboy for his initial interview testimony and then for his grand jury testimony.

**15.** Other general considerations also mandate the conclusion that deposition testimony is independent evidence. A civil action is clearly a proceeding which is separate and distinct from

a grand jury investigation or subsequent criminal trial. Because civil discovery constitutes an independent stage of litigation, testimony given in discovery would be deemed an independent source of evidence. Thus, for example, one who has freely given non-immunized grand jury testimony may nonetheless assert the Fifth Amendment privilege in subsequent proceedings. *See, e. g., United States v. Cain*, 544 F.2d 1113, 1115 (1st Cir. 1976) (Justice Clark, sitting by designation); *United States v. Johnson*, 488 F.2d 1206, 1208 (1st Cir. 1973) *citing* 8 *Wigmore on Evidence* § 2276, 470–72 (McNaughton rev. 1961; Supp.1972).

based on questions from previously immunized testimony is necessarily immunized, is that this theory results in improper de facto grants of immunity by courts. As the *Franey* court stated, "even if the court's finding that the witness' testimony would be 'derived' from immunized testimony were manifestly wrong, the court's order compelling the testimony would operate to immunize the testimony because of the 'well-established [exclusionary] rule' ...." 620 F.2d at 1093.

In a curious footnote, the *Fleischacker* court conceded the very real danger of de facto immunity. That court acknowledged that the exclusionary rule does indeed result in de facto immunity; emphasized that the exclusionary rule was solely remedial and thus could not be used to justify a denial of the Fifth Amendment's protection; and then stated that conferral of de facto immunity was unauthorized. 644 F.2d at 78 n.13.[16] But the *Fleischacker* court reasoned that no de facto immunity would occur because it was convinced that the *answers* to a subsequent deposition would necessarily "derive from" the previous immunized testimony.

First, as discussed earlier, it does *not* follow that answers to subsequent testimony are necessarily "derived from" previously immunized testimony. Second, the *Fleischacker* reasoning bootstraps the critical question in issue. It assumes there will be no de facto grant of immunity because its analysis is "correct". But the critical feature of de facto immunity is that it occurs even when a court's analysis is "correct". If a court incorrectly determines that subse-

quent testimony was immunized, then it can and should remedy the error—i. e., the violation of the witness' Fifth Amendment privilege—through the exclusionary rule. But the key point is that, regardless of the correctness of the decision, as even the *Fleischacker* court seemed to admit in its footnote, the reliance on such a later remedy *necessarily* involves a prospective grant of improper de facto immunity.

The impropriety of such immunity is clearly explained by the court in *Ellis v. United States*, 416 F.2d 791, 796 (D.D.C. 1969):

> A trial judge cannot reject a witness's claim of privilege merely on the ground that the ruling cannot hurt the witness because it will establish an immunity from subsequent prosecution.
>
> We are not here concerned with a case where a judge has made a mistake in applying legal rules, like a case where he erroneously rules that a witness has waived his privilege. In the case before us, the judge did not purport to deny that the witness had correctly presented a claim of privilege. He merely asserted that the witness would nevertheless be protected, by *Murphy*, against prosecution based on his testimony.
>
> The ruling was made by an able and conscientious trial judge. We are confident it was made in good faith, and can even discern how the judge may have come to a mis-reading of *Murphy*. *Nevertheless, his ruling was in the nature of a circular, self-fulfilling prophecy that in substance can only be viewed as a grant of immunity. That ruling was outside the scope of judicial authority.*

---

**16.** The *Fleischacker* Court's discussion of this issue is as follows:

> Immunity is a creature of statute and as such can be conferred only in a manner consistent with its legislative design.... Section 6003 empowers the executive branch of the government to confer immunity upon a witness to compel testimony over an assertion of privilege; courts cannot confer immunity upon a witness on their own initiative.... *The discretion is placed in the executive branch, not in the judiciary....* Nevertheless, where a "district court errs in making a rule on privilege an after-the-fact exclusionary rule will apply to prevent the

introduction of that evidence against the witness." ... *Thus, the operation of the exclusionary rule results in a de facto grant of immunity.* But [sic] *"this exclusionary rule is solely remedial and cannot be used as a rationale to support a judicial decision which contravenes the fifth amendment's protection."* ... Though the protection afforded a witness by *de facto* immunity grants necessarily must be coextensive with grants of immunity obtained under the immunity statute, conferral of *de facto* immunity is nevertheless unauthorized.

644 F.2d at 78 n.13 (emphasis added) (citations omitted).

(emphasis added). *See In re Folding Carton Antitrust Litigation*, 465 F.Supp. 618, 628 (N.D.Ill.1979), *rev'd on other grounds, Brown*, 609 F.2d 867. In denying Conboy's Fifth Amendment claims the district court made a prospective determination that Conboy's future deposition testimony would necessarily be tainted, and thus compelled his deposition testimony. This is precisely what a court cannot do. *Brown*, 609 F.2d at 872 n.11; *Ellis*, 416 F.2d at 796; *In re Folding Carton Antitrust Litigation*, 465 F.Supp. at 628.

■ To let stand the district court's order regarding Conboy's Fifth Amendment claims would improperly extend the power of the judiciary beyond its intended scope. The immunity statute specifically restricts the authority to initiate an immunity order to U.S. Attorneys, with the approval of the Attorney General. 18 U.S.C. § 6003. A court has no power to issue immunity sua sponte; the power to grant immunity lies only with the Executive. *Ryan v. Commissioner*, 568 F.2d 531, 540 (7th Cir. 1978); *In re Daley*, 549 F.2d 469, 479 (7th Cir. 1977).

The district court, by compelling Conboy's deposition, has improperly expanded the narrow *use* immunity previously afforded by the government with regard to *criminal* proceedings into an order by which *civil* plaintiffs obtain testimony for their use in a totally different judicial proceeding. Compelling Conboy's testimony here would result in conferring upon private civil litigants the power to effect a grant of broad *transactional* immunity by intentionally violating a witness' Fifth Amendment rights.[17]

bly to the next, and perhaps most fundamental, flaw in that theory. The district court, in compelling Conboy's deposition testimony, is predicting that in a future criminal prosecution of Conboy, another court will agree with the district court's determination that the deposition testimony should be excluded. But, as we recognized in *Brown*, the exclusionary rule is remedial and cannot be used as a rationale to support a judicial decision which contravenes the Fifth Amendment's protection. 609 F.2d at 872 n.11.

No government prosecutor is a party to this litigation. There is no guarantee that, in a subsequent prosecution of Conboy, another court will agree with the district court's reasoning. It is simply not possible to assume that no subsequent court could *ever* admit the deposition testimony.

In summary, the district court's order places Conboy on the horns of the following dilemma. Either all courts must be bound by the determination that Conboy's deposition is tainted, or future courts are not bound by that determination. If all courts are bound, then the district court has improperly transformed statutory use immunity into de facto judicial transactional immunity. If future courts are not bound, Conboy's Fifth Amendment rights have not been supplanted with "coextensive" protection, as required by *Kastigar*. Rather, his Fifth Amendment rights will have been stripped away based on a tenuous prediction of future events. Constitutional rights are too vital to be sacrificed to such predictions.

### D

■ The foregoing problems in the *Fleischacker* immunity theory lead inexora-

### V

In addition to the two broad issues of this case, whether Conboy faces any risk of

---

**17.** As the district court stated in *Folding Carton Litigation*, 465 F.Supp. at 629, *rev'd on other grounds, Brown*, 609 F.2d 867:

Such an expansion of the witnesses' immunity would come at the plaintiffs' request, not the government's. Plaintiffs would essentially be in the position of granting immunity which is a result inconsistent with Congress' antitrust policy ... and with congressional policy limiting the power to authorize grants

of immunity to the Executive Branch.... Under circumstances where the witnesses have "a reasonable fear of prosecution," compelling the deposition testimony of these five witnesses would essentially constitute an impermissible transformation of the limited "use" immunity grant envisioned under § 6002 into a "transactional" immunity grant....

(citations omitted).

prosecution and whether his deposition testimony is necessarily tainted, there are serious practical problems with ordering Conboy's deposition. First, if Conboy's answers at his deposition are even inconsistent with his earlier answers during the preliminary interview or at the grand jury interview, he could be subject to prosecution for perjury or giving false statements even without a specification in the indictment as to which answer is false. *See* 18 U.S.C. § 1623(c).

 Recently, the Supreme Court has ruled that perjury prosecutions based on immunized testimony are permissible and that all statements made during the giving of immunized testimony, both true and false, may be admitted in the course of a subsequent perjury action if such use was not otherwise prohibited by the Fifth Amendment. *United States v. Apfelbaum*, 445 U.S. 115, 123, 100 S.Ct. 948, 953, 63 L.Ed.2d 250 (1980). Similarly, in *United States v. Housand*, 550 F.2d 818 (2d Cir. 1977), the court held that a witness, in precisely the situation confronting Conboy here, could claim his Fifth Amendment privilege and refuse to testify a second time on matters about which he had previously given immunized testimony, since an inconsistency might give rise to a perjury or false statements prosecution.[18]

Second, Conboy faces a serious problem of waiver. He and his counsel will have the heavy burden of ensuring that he does not stray even an inch beyond the four corners of the earlier transcripts. We realize that he and his counsel will have the transcripts before them, but emphasize that the burden of monitoring past and present testimony will be unduly onerous. For the slightest misstep—and questions may be strategically designed to induce such a misstep—could be fatal.

 Moreover, it is well established that "[d]isclosure of a fact waives the privilege

as to details." *Rogers v. United States*, 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951). For example, in earlier testimony, Conboy may only have testified *that* certain price communications occurred. If he repeats this testimony in the civil deposition, he may be found, by another court, to have waived his Fifth Amendment privilege as to *details* of those communications to which he had not earlier testified. Such details may, in turn, provide investigative leads to incriminating matters totally untouched in the earlier testimony. Thus, Conboy faces very real waiver problems.

## VI

Finally, the district court order compelling Conboy's testimony may be unnecessary in any event inasmuch as Conboy's grand jury testimony would in most likelihood become admissible as the result of Conboy's assertion of his privilege against self-incrimination. Rule 804 of the Federal Rules of Evidence permits former testimony to be introduced if the "declarant is unavailable as a witness" and if the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

 First, a witness who asserts his privilege against self-incrimination "is unavailable." *United States v. Zurosky*, 614 F.2d 779, 792 (1st Cir. 1979); *United States v. Toney*, 599 F.2d 787, 789–90 (6th Cir. 1979); *Witham v. Mabry*, 596 F.2d 293, 297 (8th Cir. 1979); *United States v. Lang*, 589 F.2d 92, 95 (2d Cir. 1978).

Second, Conboy asserts and the plaintiffs do not deny, that at least some of the parties against whom the earlier testimony could be offered have had the opportunity to develop the immunized testimony by cross-examination in the prior criminal proceeding. It may be, however, that the "op-

---

**18.** The *Housand* court stated:

> The Fifth Amendment privilege question arises when the witness refuses to answer on the ground that his *second* version of the event may result in his prosecution for perjury .... [T]he giving of truthful [but incon-

> sistent] testimony on the second occasion could surely trigger investigation of whether the original testimony was false .... This is a reasonable cause for apprehension and supports the claim of privilege.
> 550 F.2d at 823.

portunity for cross-examination" aspect of Fed.R.Evid. 804(a) is inapplicable, since Conboy's Fifth Amendment privilege may have prevented any opportunity for cross-examination.

The "opportunity for cross-examination" objection may not resolve this situation because it is too broad. Plaintiffs have stated that they do not intend to ask any questions beyond those asked in the earlier transcripts. It is undisputed that Conboy has, and will exercise, his Fifth Amendment privilege to refuse to answer any such questions. Defendants will not, therefore, have any real opportunity to cross-examine at the deposition. In practical terms, there is no difference between a lack of opportunity for cross-examination at the grand jury and before the Justice Department and the lack of opportunity for cross-examination at a new deposition. Thus, if the "opportunity for a cross-examination" objection would preclude admission of the prior transcripts, it would also preclude admission of the new deposition.

Although it is conceivable that the district court might not admit Conboy's grand jury testimony for some reason, in our view this risk is preferable to taking the risk that Conboy will never be prosecuted when there exists the possibility that he will be prosecuted.

### VII

The critical question in this case is whether the fundamental Fifth Amendment protection against self-incrimination should be sacrificed to the plaintiffs' need for evidence in their civil litigation. The answer is that a plaintiff is only entitled to that evidence which is not otherwise protected. *Branzburg*, 408 U.S. at 688, 92 S.Ct. at 2660.

Recently, in *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), the Court reaffirmed the fundamental primacy of the Fifth Amendment. In *Portash*, the Court held that the Fifth Amendment prohibits the use of a witness' immunized grand jury testimony to impeach the trial testimony of that witness. Surely, if the interests of securing justice

free of the taint of perjured testimony in a criminal trial are overridden by the dictates of the Fifth Amendment, the mere denial of certain discovery to civil plaintiffs, especially when the same testimony has been secured previously, should hardly allow any curtailment of the privilege against self-incrimination. Any inconvenience to the plaintiffs must pale in the face of denial of the fundamental right against self-incrimination.

In sum, we are asked to rely on too many uncertainties. Plaintiffs assure us that Conboy will not be prosecuted. But Conboy might be prosecuted. Plaintiffs assure us that the deposition testimony could never be used against Conboy. But that testimony might be used against him. And when he does testify, he might face the possibility of perjury or waiver.

In the face of these uncertainties, we should not conclude that Conboy's Fifth Amendment protections do not apply. We reverse the lower court judgment.

CUMMINGS, Chief Judge, dissenting.

For the reasons so ably presented in Judge Swygert's majority panel opinion, 655 F.2d 748 (7th Cir. 1981), I cannot agree with the majority *en banc* opinion. I merely wish to add a few words to Judge Swygert's prior opinion herein.

The *en banc* opinion faults both the panel opinion and the Second Circuit's similar analysis in *In re Corrugated Container Antitrust Litigation, Appeal of Fleischacker*, 644 F.2d 70 (2d Cir. 1981), for failing to grasp that under 18 U.S.C. § 6002 only the deposition questions would be derived from Mr. Conboy's earlier immune testimony, while any answers would come from his independent recollection. This is an arid distinction: it rests on an unduly restrictive reading of the statutory language and on a misconception about the effect of repetition of testimony.

Section 6002 prevents both state and federal prosecutors from using "testimony or other information compelled under [a Section 6002 grant of immunity] (or any infor-

mation directly or indirectly derived from such testimony or other information) * * * against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order [granting immunity]." The panel majority would have treated Mr. Conboy's answers as falling within the category of "information directly or indirectly derived" from his immune testimony, where the questions were asked so as to afford Mr. Conboy the choice of (1) repeating his originally immunized answer, (2) adopting his immunized answer when it was repeated to him, or (3) affirming that the transcript of his immunized answer was his prior testimony. See note 2 *supra*.

The *en banc* majority admits that the questions asked of Mr. Conboy were "information directly or indirectly derived from [the immunized testimony]," but argues that the answers, no matter how closely they replicated the earlier responses, cannot be. No explanation is offered for giving the general word "information" in Section 6002 such a particularized meaning, but there seems to be an almost metaphysical notion that the mere repetition or acknowledgment by Mr. Conboy of his earlier testimony constitutes new and independent evidence.

In no case cited in the *en banc* majority's discussion, pages 1154–1155 and note 14 *supra*, does a witness who had been granted immunity in one proceeding forfeit it simply by testifying in another proceeding. Thus *United States v. Kuehn*, 562 F.2d 427 (7th .Cir. 1977), does not suggest that "the defendant had created independent testimony by repeating his immunized testimony as a witness in another trial," page 1154 *supra*. It makes two less controversial points: (1) that a state prosecutor, who began his investigations before federal immunity was granted and took the results to a grand jury without knowledge of the immunized testimony, did not use information "directly or indirectly derived" from the immunized testimony, 562 F.2d at 430; and (2) that the witness, by talking voluntarily to a newspaper reporter, had "created independent evidence legitimately available to the state

prosecutor," *id.* at 432. *United States v. First Western State Bank of Minot*, 491 F.2d 780 (8th Cir. 1974), certiorari denied *sub nom. Thompson v. United States*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49, holds only that defendants who had been granted transactional immunity for state grand jury proceedings could be prosecuted on federal charges if the federal prosecutors could show independent and untainted sources for their evidence. Repetition of testimony was not a problem since defendants had given no testimony in the interval between the state grand jury appearance and the federal criminal case. In *United States v. Miranti*, 253 F.2d 135 (2d Cir. 1958), defendants had never been granted immunity for their grand jury testimony and were therefore entitled to interpose the Fifth Amendment in subsequent proceedings where repetition of the earlier testimony was sought.

In contrast to these factually inapposite cases, Judge (now Justice) Stevens' strong dictum in *Patrick v. United States*, 524 F.2d 1109 (7th Cir. 1975), is directly on point. There the Internal Revenue Service had approved a jeopardy assessment against the taxpayer based on his immunized grand jury testimony about his gambling activities and income. The taxpayer argued that forcing him to resort to a refund suit would burden · his Fifth Amendment rights. He would be put to a Hobson's Choice: he must either repeat his grand testimony and lose his immunity or forego his refund claim. Judge Stevens' answer to Mr. Patrick's plight applies equally to Mr. Conboy's: "[O]n the facts alleged by Patrick, such later testimony would be elicited only because the government could use the grand jury testimony as a basis for the assessment. Thus, any testimony elicited in the tax proceeding would be 'information . . . indirectly derived from . . . testimony' compelled under the original immunity grant and thus could not be used against Patrick in any criminal proceeding." 524 F.2d at 1120.

The method of the *en banc* majority is first to read the use immunity statute to afford only parlous and nugatory protection

and then, of necessity, to find such protection an inadequate substitute for Fifth Amendment rights. In my opinion, the district court's contempt order should be affirmed.